UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JERMAINE MAJOR-LANG,

               Petitioner,

v.

G. SKIPPER,

               Respondent.

_____/

Case No. 1:21-cv-191

Honorable Janet T. Neff

## **OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, Rules Governing § 2254 Cases; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436–37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

## Discussion

### I.  Factual allegations

Petitioner Jermaine Major-Lang is incarcerated with the Michigan Department of Corrections at the Michigan Reformatory (RMI) in Ionia, Ionia County, Michigan.  On December 8, 2017, following a three-day jury trial in the Muskegon County Circuit Court, Petitioner was convicted of first-degree child abuse, in violation of Mich. Comp. Laws § 750.136b(2), assault with intent to commit murder (AWIM), in violation of Mich. Comp. Laws § 750.83, and use of a firearm during the commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b.  On February 14, 2018, the court sentenced Petitioner as a third habitual offender, Mich. Comp. Laws § 769.11, to concurrent sentences of 21 to 43 years for first-degree child abuse and 26 to 45 years for AWIM.  Those sentences were to be served consecutively to a sentence of 2 years for felony-firearm.

The Court received the petition on February 26, 2021.  Under Sixth Circuit precedent, the application is deemed filed when handed to prison authorities for mailing to the federal court.  *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002).  Petitioner placed his petition in the prison mailing system on February 8, 2021.  (Pet., ECF No. 1, PageID.22.)  The petition is timely.

The petition raises four grounds for relief, as follows:

I.     Deprived of my right to a fair trial when court allowed [the admission of testimony regarding] un-related and un-reported instance of domestic [violence despite] the prosecution[']s failure to give proper notice in advance of trial.

II.    Being deprived of my . . . state and federal right to effective assistance of counsel [because] my trial attorney . . . failed to investigate and have a[n]

2

expert witness to dispute the prosecutor[']s medical examiner, being that was a vital part of my defense.

III.    Abuse of discretion/denied a right to a fair trial by trial judge.  When the prior bad acts were brought up[,] Judge Hicks really insinuated the MCL for the prosecutor, because the prosecutor was unsure of which way to approach the incident[,] he was still going [through] MCL during the course of the trial before Judge Hicks gave him the route to take.

IV.    Procedural due process.  In the child abuse charge in all documents including warrants, indictment, pre-sentence investigation report, complaint felony, it does not inform me on the nature of the crime, not telling me what I [am] suppose[d] to have done, only describing the MCL 750.136b(2)— "did knowingly or intentionally cause serious physical harm to a child."

(Pet., ECF No. 1, PageID.6, 10, 13–14.)

The Michigan Court of Appeals described the facts underlying Petitioner's prosecution as follows:

This case stems from allegations that defendant caused injuries to Nicole Taylor's daughter, LH, and subsequently shot Taylor in the leg in an attempt to kill Taylor.

Taylor was defendant's girlfriend.  Defendant lived with Taylor at her apartment, along with the couple's three-month-old daughter and 18-month-old LH.  Although defendant was not LH's father, Taylor indicated that defendant treated her like his daughter.  Taylor testified that on November 3, 2016, she left the children in defendant's care for eight hours while she went to work.  Nobody else was in the apartment when she left.  While she was gone, Taylor communicated with defendant via cell phone.  During these calls, defendant indicated that he "had whupped" LH because she spilled something.  Defendant sounded calm, so Taylor assumed that it was a minor discipline incident.  Defendant left when Taylor returned home.  Taylor checked on LH and found her shaking and with blood in her diaper.  Taylor texted defendant and told him that they needed to take LH to the hospital because of concerns regarding a urinary tract infection.  However, Taylor also saw that LH was bruised in the stomach.  When defendant returned to the apartment, he suggested waiting a few days because she had bruises and he thought that people at the hospital might find that suspicious.

Taylor texted her mother and requested that she call 911.  The police arrived, and LH was transported to the hospital where she was examined.  LH was subsequently transferred to DeVos Children's Hospital where she underwent

3

further testing.  Taylor testified that she was told that LH's hymen was torn but that there was no proof of penetration, that LH had two spinal fractures, and that LH's bruises were fresh.  Although Taylor acknowledged that LH already had a "scratch" on her face from a fall at church one or two days previously, Taylor indicated that the other injuries were new.  Taylor did not see this fall because LH had been taken to church by her relatives.

Taylor and LH returned home about 4:00 or 5:00 p.m. on November 4, 2016.  At some point thereafter, defendant arrived at the apartment.  Taylor testified that defendant pulled out his gun, shot the floor of the living room, pointed the gun at her, and told her to sit down.  Taylor had her three-month old daughter in her arms.  The gun jammed, and defendant fixed it.  Defendant made a number of statements blaming Taylor for calling the police about LH.  Taylor's mother arrived outside the apartment as this commotion was unfolding and called the police. Taylor testified that defendant told her that everyone in the house was going to die except for their three-month-old daughter.  According to Taylor, defendant pointed the gun at LH and Taylor began to cry, scream, and plead with defendant.  Then defendant shot Taylor in the leg while she was standing next to the door.  Defendant subsequently tried to shoot himself in the forehead, but the gun was jammed. Defendant left.  Taylor managed to crawl out of her apartment, by which time the paramedics had already arrived.

Dr. Yvonne Mallon, one of the medical doctors who examined and treated LH's injuries, testified at trial as an expert in child abuse and child sexual abuse. Mallon testified that LH had multiple bruises in various areas of her body, including both sides of her abdomen, and that LH had two compression fractures in the middle portion of her spine.  Blood was also found in LH's vaginal exam.  Mallon explained that LH's bruises "stood out" because they were in "soft areas," such as the abdomen, where it was unusual for a child to "get an accidental bruise."  In her experience, children normally get bruises along boney surfaces such as their shins, knees, elbows, or forehead.  Mallon opined that bruises in locations like the stomach or "a protected spot," such as the buttocks, caused "concern[] for non-accidental injuries."  Mallon further testified that LH had bruises on the right side of her face, behind her left []ear, above her buttocks, on her arm, on her wrist, and on her finger.  Mallon testified that it was also concerning to see bruising that was bilateral, or on two different planes of the child's body, since an accidental fall would usually involve falling on one side of the body.  LH's bilateral bruising was also indicative of a non-accidental injury.

Regarding the spinal compression fractures, Mallon testified that a compression fracture usually occurs from a heavy fall involving something falling on the head or falling on the buttocks against something hard.   According to Mallon, such a fall could occur from either a high distance or from a short distance with additional force.  She opined that, assuming "normal bones," a fall from a

standard chair to the ground would not cause compression fractures.  Mallon
testified that LH's bones appeared normal based on her x-rays and examination.
Mallon also ruled out a fall from "Pack & Play" as the source of LH's injuries.  In
addition, Dr. Mallon testified that the damage to the minor child's hymen made her
extremely suspicious that there was "non-accidental penetrating genital trauma"
since a typical accidental straddle fall would instead result in injuries of a different
nature.

Defendant testified that he did not know why LH had blood in her diaper or
how she incurred her various serious injuries. He indicated that on November 2,
2016, LH had bruises or scratches on her face after returning from staying with
relatives.  Defendant testified that he had friends over to the apartment on
November 3, 2016, and that LH was at defendant's mother's house earlier in the
day.  He also testified that he watched LH that day and that when he told Taylor
that he "whup[ped]" LH, he meant that he "had popped her on her hand."
Defendant denied physically disciplining LH in any other way.  Defendant stated
that LH was an active child and that she sometimes would get "caught up in" her
"Pack & Play" while climbing in and out of it by herself.  Defendant further testified
that he typically slept all day while the children watched television.  Regarding the
shooting incident, defendant claimed that he never intended to use the gun, or to
shoot or kill Taylor, when he confronted her.  He admitted that he shot Taylor in
the leg but claimed that it "wasn't no intent" and that it was "really a scare tactic."
Defendant testified that he meant to shoot the wall again but hit Taylor instead.
Defendant denied saying that everyone other than the youngest child was going to
die.

*People v. Major-Lang*, No. 342706, 2019 WL 3311980, at *1–2 (Mich. Ct. App. Jul. 23, 2019).

"The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review

pursuant to 28 U.S.C. § 2254(e)(1)."  *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016).

Although Petitioner denies that the events occurred as described by the other witnesses, his habeas

challenges do not call into question the accuracy of the appellate court's description of the

testimony.

Petitioner, with the assistance of counsel, appealed his convictions to the Michigan

Court of Appeals, raising the same issues he raises in his petition as habeas grounds I and II.  By

opinion issued July 23, 2019, the Michigan Court of Appeals rejected Petitioner's challenges and affirmed the trial court.

Petitioner, again with the assistance of counsel, filed an application for leave to appeal to the Michigan Supreme Court, raising the same issues he raised in the Michigan Court of Appeals. By order entered February 4, 2020, the Michigan Supreme Court denied leave to appeal. *People v. Major-Lang*, 937 N.W.2d 668 (Mich. 2020). This petition followed.

## II.     Exhaustion

Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *Id.* at 844, 848; *see also Picard v. Connor*, 404 U.S. 270, 275-77 (1971); *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court. *O'Sullivan*, 526 U.S. at 845; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). The district court can and must raise the exhaustion issue *sua sponte* when it clearly appears that habeas claims have not been presented to the state courts. *See Prather v. Rees*, 822 F.2d 1418, 1422 (6th Cir. 1987); *Allen*, 424 F.2d at 138-39.

Petitioner bears the burden of showing exhaustion. *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Petitioner reports that he raised habeas grounds I and II at all levels of the state appellate system. (Pet., ECF No. 1, PageID.6, 10.) With regard to habeas ground III,

6

however, Petitioner acknowledges that "this [is] the 1st time [he is] bringing the issue up."  (*Id.*, PageID.13.)  Similarly, with regard to habeas ground IV, Petitioner acknowledges he did not raise the issue on appeal.  (*Id.*, PageID.14.)  Petitioner claims his lawyer did not look into the issue and that Petitioner was "un-aware of this newly found information until [he] started to look into [his] case [himself]."  (*Id.*, PageID.14, 19.)

An applicant has not exhausted available state remedies if he has the right under state law to raise, by any available procedure, the question presented.  28 U.S.C. § 2254(c). Petitioner has at least one available procedure by which to raise the issues he has presented in this application.  He may file a motion for relief from judgment under Mich. Ct. R. 6.500 *et seq.*  Under Michigan law, one such motion may be filed after August 1, 1995.  Mich. Ct. R. 6.502(G)(1). Petitioner has not yet filed his one allotted motion.

Although Petitioner's failure to exhaust habeas grounds III and IV in the state courts prevents this Court from granting habeas relief, it does not foreclose denying such relief on the merits.  "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2); *see also Rhines v. Weber*, 544 U.S. 269, 277 (2005) (noting that a district court should deny a stay where unexhausted claims are meritless because, under 28 U.S.C. § 2254(b)(2) such claims may be properly denied); *Smith v. Nagy*, 962 F.3d 192, 204 (6th Cir. 2020) (court rejected unexhausted claim on the merits citing 28 U.S.C. § 2254(b)(2)); *Harris v. Lafler*, 553 F.3d 1028, 1031–32 (6th Cir. 2009) (explaining that a district court may "ignore the exhaustion requirement altogether and *deny* the petition if *none* of the petitioner's claims has any merit")

(emphasis in original).  As set forth fully below, none of Petitioner's claims has any merit; accordingly, the Court will consider, and deny relief on, Petitioner's unexhausted claims.

## III.    AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693– 94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."  *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (internal quotation marks omitted)).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state

courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate

courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia, Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"— for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## IV.    Prior bad acts (habeas ground I)

Taylor's testimony regarding the events that led to LH's hospital visit indicated that Petitioner had committed violent acts against Taylor in the past:

> At trial, Taylor testified that when defendant resisted taking LH to the hospital, Taylor texted her mother and asked her to call 911. Taylor testified that she did not want to call the police herself because she was scared of defendant. After a discussion was held outside the presence of the jury regarding the direction the testimony was taking and potential issues with admissibility, the jury was brought back into the courtroom and Taylor testified that she was afraid of defendant hurting her because "he had domestic violence issues in the past." Taylor explained, "We fought a lot and I was usually on the losing side when we fought." Taylor further testified that she received wounds from their fights, such as "[b]lack eye, busted lip, burns." Taylor testified that defendant also "stabbed" her in her legs the "last time [she] tried to leave."

*People v. Major-Lang*, No. 342706, 2019 WL 3311980, at *3 (Mich. Ct. App. Jul. 23, 2019). Petitioner's counsel objected to admission of this "prior bad act" testimony under Michigan statutes and the Michigan Rules of Evidence. The trial court allowed the testimony and the court of appeals affirmed that decision. Petitioner contends that the evidence regarding prior instances of domestic violence was not properly admitted under Michigan's statutes or rules of evidence and that the evidence was highly prejudicial and rendered his trial unfair.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." 502 U.S. at 67–68.[1] Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

---

[1] The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). The state court's decision that the evidence was properly admitted under state statues and rules is axiomatically correct on habeas review.

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders*, 221 F.3d at 860. Petitioner has not met this difficult standard.

There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process.  *Estelle*, 502 U.S. at 75.  The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n.5.

While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512.  Therefore, the state court's admission of such evidence cannot be contrary to, or an unreasonable application of, clearly established federal law and Petitioner is not entitled to habeas relief on this claim.

## V.     Ineffective assistance of counsel (habeas ground II)

Petitioner next claims that his counsel rendered ineffective assistance because she did not adequately investigate obtaining an expert to counter the expert testimony provided by Dr.

Mallon.  To support his claim, Petitioner attaches to his petition—and provided to the Michigan Court of Appeals—a proffer regarding what such opposing expert testimony might be.  (Sept. 25, 2018, Report of Explico Eng'g, ECF No. 1-1, PageID.28–29.)  The report offered by Petitioner indicates that the authors, biomechanical engineers Keith D. Button, Ph.D. P.E. and Steven Rundell Ph.D. P.E., reviewed the trial transcripts and LH's medical records.  The crux of the report is that Dr. Mallon's conclusion that the compression fracture likely occurred from a force or a fall from a high distance was wrong, because, according to the authors, falls from a short height might also produce such compression fracture(s).  (*Id.*)

Under clearly established federal law, to show ineffective assistance of counsel, the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *Strickland v. Washington,* 466 U.S. 668, 687 (1984).  A court considering a claim of ineffective assistance "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  Even if a court determines that counsel's performance, in light of the circumstances as they existed at the time of counsel's action, was outside the wide range of reasonable professional assistance, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 690–91.

Although the state court of appeals relied on state authority for the relevant standard, the standard it applied when rejecting Petitioner's claim was functionally identical to the *Strickland* standard:

"A defendant that claims he has been denied the effective assistance of counsel must establish (1) the performance of his counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." [*People v Sabin (On Second Remand)*, 242 Mich App 656, 658–659; 620 NW2d 19 (2000).]   "A defendant must overcome a strong presumption that the assistance of his counsel was sound trial strategy, and he must show that, but for counsel's error, the outcome of the trial would have been different." *Id*.

In support of his ineffective assistance of counsel claim, as well as his alternative request that we remand this matter for an evidentiary hearing to develop a further factual record, defendant has submitted to this Court an "offer of proof" completed by appellate counsel and a report prepared by biomechanical engineers Keith Button and Steven Rundell.  In appellate counsel's offer of proof, appellate counsel states that he spoke to defendant's trial counsel, who informed appellate counsel that she did not consult an expert or consider calling one to testify at trial. The report prepared by Button and Rundell states that despite Mallon's testimony, vertebral compression fractures may be caused by an "accidental fall from a short height (less than 2 meters)" and that there "is absolutely no scientific or biomechanical foundation to conclude that the kinematic environment associated with that required to cause compressive fractures of the thoracic spine is 'non-accidental.'"   The report states further that "there is no indication that any biomechanical calculations were performed to determine the actual forces [LH] would have experienced as a result of a fall from any height.  Therefore, there is no basis to support Dr. Mallon's conclusion that the injuries sustained by [LH] were not accidental nor is there basis to support Dr. Mallon's opinions regarding fall height required to produce fracture."

Even if we were to assume that defense counsel's decision not to engage an expert without first conducting a reasonable investigation fell below an objective standard of reasonableness, see *People v. Ackley*, 497 Mich 381, 390; 870 NW2d 858 (2015) ("While an attorney's selection of an expert witness may be a 'paradigmatic example' of trial strategy, that is so only when it is made 'after thorough investigation of [the] law and facts' in a case.") (citation omitted; emphasis and alteration in original); see also *id*. at 383-387, 389, 393 (concluding that "counsel's efforts to investigate and attempt to secure suitable expert assistance in preparing and presenting defendant's case fell below an objective standard of reasonableness" where defense counsel failed to contact expert witnesses to whom he had been referred and who could have testified in support of the defense theory that the decedent child victim's injuries were the result of an accidental fall rather than blunt force trauma or shaking), defendant still has not demonstrated that his proposed expert evidence establishes a reasonable probability that the outcome of the proceedings would have been different.

The report by Button and Rundell only discusses whether spinal compression fractures may be caused by accidental short falls but does not

specifically address whether any of the other injuries suffered by LH—which included injuries to her hymen and bilateral bruising on soft, protected areas of her body—could have been caused by accidental means.  The report also does not include any discussion addressing Mallon's opinions that the location of the bruising (on soft, protected areas where children are unlikely to get accidental bruises), the bilateral nature of the bruising, and the nature and location of the injuries to the child's hymen all suggested non-accidental causation.  Moreover, there was testimony that defendant had told Taylor that he "whupped" LH:  the jury could have reasonably determined that an exceedingly forceful physical assault was the non-accidental cause that explained LH's various injuries.  The expert report submitted by defendant on appeal merely quibbles with Mallon's opinions about fall height as a potential cause of the injuries.

Because the report does not address LH's multiple other injuries or the evidence suggesting a cause other than a fall of any kind, defendant has not demonstrated that the proposed expert testimony that he argues defense counsel should have obtained could reasonably have resulted in a different outcome at trial. *Sabin*, 242 Mich App at 659.  "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense," *People v. Russel*, 297 Mich App 707, 716; 825 NW2d 623 (2012) (quotation marks and citation omitted; alteration in original), and "[a] substantial defense is one that might have made a difference in the outcome of the trial," *People v. Jackson (On Reconsideration)*, 313 Mich App 409, 432; 884 NW2d 297 (2015) (quotation marks and citation omitted).  Defendant has therefore failed to demonstrate that he received ineffective assistance of counsel because he has not shown that he was prejudiced by defense counsel's performance.  *Strickland v. Washington*, 466 US 668, 700; 104 S Ct 2052; 80 L Ed 2d 674 (1984) ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.").

*People v. Major-Lang*, 2019 WL 3311980, at *5–6 (footnotes omitted).

Petitioner does not respond to the determinations of the state appellate court. Petitioner simply reiterates the assertion that his counsel's failure to investigate expert testimony was professionally unreasonable—a point the court of appeals presumed without deciding—and relies on the Explico report to show prejudice.  He does not challenge the state court's conclusion that the singular focus of the engineers' report on the compression fractures renders the report hopelessly unpersuasive when examining all of the injuries that prompted Dr. Mallon's opinion that the injuries were not accidental.

15

*Strickland* requires the court to assess whether counsel's professionally unreasonable conduct had any effect on the judgment.  The court of appeals considered Dr. Mallon's testimony and Petitioner's proffer and concluded that Petitioner had failed to show any impact on the result.  Petitioner does not challenge the appellate court's factual determinations regarding the injuries, the testimony, or the proffer.  Those determinations appear to be well-founded and Petitioner has certainly failed to provide clear and convincing evidence to counter them.  Accordingly, the Court accepts them as true.  Under the circumstances, the Michigan Court of Appeals' rejection of Petitioner's ineffective assistance claim is entirely consistent with, and not contrary to or an unreasonable application of, *Strickland*.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

## VI.    Judicial bias

Petitioner next complains that Judge Hicks became over-involved in the "prior bad acts" issue when he proposed the admissibility of that evidence under Mich. Comp. Laws § 768.27, regarding proof of intent or motive by similar acts.  Petitioner contends that the prosecutor otherwise was focused on admissibility under Mich. Comp. Laws § 768.27b, regarding proof of the commission of other acts of domestic violence, which requires pretrial notice.  Such notice was not given in Petitioner's case.

The court of appeals recounts the exchange between the court and the prosecutor.  That recounting supports Petitioner's contention.  It appears that Judge Hicks may have prompted the prosecutor to seek admission of the evidence under Mich. Comp. Laws § 768.27.  *People v. Major-Lang*, 2019 WL 3311980, at *3.  Petitioner claims that Judge Hicks's actions rendered his trial unfair.  Petitioner does not explain why.  Presumably, Petitioner claims that his trial was unfair because Judge Hicks was biased in favor of the prosecutor as evidenced by Judge Hicks's suggestion regarding Mich. Comp. Laws § 768.27.

16

"Due process requires a fair trial before a judge without actual bias against the defendant or an interest in the outcome of his particular case." *United States v. Armstrong*, 517 U.S. 456, 468 (1996); *see also In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process.  Fairness requires an absence of *actual* bias in the trial of cases.") (emphasis added)).  However, because of the difficulty in determining "whether a judge harbors an actual, subjective bias," the courts look to "whether, as an objective matter, the average judge in [that judge's] position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (internal quotations omitted); *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 883 (2009).

The Supreme Court has recognized constitutionally impermissible, objective indicia of bias in the following types of cases:  (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey v. Ohio*, 273 U.S. 510, 523 (1997) (subsequently expanded to include even indirect pecuniary interest, *see Railey v. Webb*, 540 F.3d 393, 399–400 (6th Cir. 2008); (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *Murchison*, 349 U.S. at 141 (subsequently clarified to involve cases in which the judge suffers a severe personal insult or attack from the contemnor); and (3) cases in which a judge had prior involvement in the case as a prosecutor, *Williams*, 136 S. Ct. at 1905 (citing *Withrow v. Larkin*, 421 U.S. 35, 53 (1975)).  The courts indulge "a presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47; *Coley v. Bagley*, 706 F.3d 741, 751 (6th Cir. 2013) (citing, *inter alia*, *Withrow*, 421 U.S. at 47).  "The presumption of impartiality stems not merely from the judicial-bias caselaw, but from the more generally applicable presumption that judges know the law and apply it in

17

making their decisions, *see Lambrix v. Singletary*, 520 U.S. 518, 532 n.4 (1997), and the even more generally applicable presumption of regularity, *see Parke v. Raley*, 506 U.S. 20, 30–31.” *Coley*, 706 F.3d at 751.

In *Liteky v. United States*, 510 U.S. 540 (1994),[2] the Supreme Court described the showing Petitioner would have to make to succeed on his bias claim:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.  *See United States v. Grinnell Corp.*, 384 U.S. at 583.  In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved.  Almost invariably, they are proper grounds for appeal, not for recusal.  Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.  An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22 (1921), a World War I espionage case against German-American defendants:  “One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans” because their “hearts are reeking with disloyalty.”  *Id.*, at 28 (internal quotation marks omitted).  Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.  A judge’s ordinary efforts at courtroom administration—even a stern and short-tempered judge’s ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555–56.

---

[2] *Liteky* is a case that addresses the statutory recusal standard for federal judges.  The Sixth Circuit has, nonetheless, relied on *Liteky* to provide the standard for assessing judicial bias claims under the Due Process Clause.  *See Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002); *Lyell v. Renico*, 470 F.3d 1177, 1187 (6th Cir. 2006).

Here, Petitioner offers nothing more than the fact of Judge Hicks's ruling that testimony regarding Petitioner's prior acts of domestic violence was admissible under Mich. Comp. Laws § 768.27 to demonstrate the judge's bias.  As noted in *Liteky*, however, such rulings alone do not suffice to show bias.  That is particularly true here, where Petitioner does not offer a compelling argument that Judge Hicks's ruling was anything but correct.  Petitioner has offered no objective indicia of bias and the ruling of which Petitioner complains does not evidence bias either.  Accordingly, Petitioner has failed to show that his due process rights were violated by judicial bias.

**VII.    Inadequate notice**

Plaintiff next complains that the felony information was so vague that he was unable to prepare a defense to the first-degree child abuse charge.  The information and amended information provided Petitioner notice of the charge as follows: "on or about 11/03/2016, at Muskegon Heights, Muskegon County, Michigan, the defendant . . . did knowingly and intentionally cause serious physical harm to a child; contrary to Mich. Comp. Laws § 750.136b(2)."   (Am. Information, ECF No. 1-1, PageID.26; Information, ECF No. 1-1, PageID.27.)

In *Koontz v. Glossa*, 731 F.2d 365 (6th Cir. 1984), the Sixth Circuit Court of Appeals described what notice of the charges due process requires:

> The due process clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him so as to adequate preparation of his defense.  *See*, *e.g.*, *In Re Ruffalo*, 390 U.S. 544 (1968); *Blake v. Morford*, 563 F.2d 248 (6th Cir. 1977); *Watson v. Jago*, 558 F.2d 330, 338 (6th Cir. 1977).  This requires that the offense be described with some precision and certainty so as to apprise the accused of the crime with which he stands charged. Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial. *Combs v. Tennessee*, 530 F.2d at 698.

*Koontz*, 731 F.2d at 369. "Beyond notice, a claimed deficiency in a state criminal indictment is not cognizable on federal collateral review." *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002) (quoting *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986)). "An indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira*, 806 F.2d at 639.

The charge in the information and amended information provided Petitioner notice of the place and the time of the alleged criminal conduct. The charge also tracked the language in the statute regarding what constituted first-degree child abuse—"knowingly and intentionally [causing] serious physical harm to a child . . . ." Mich. Comp. Laws § 750.136b(2). The words used in the notice—and the statute—are common words with commonly understood meanings.[3]

Petitioner does not identify any way in which the alleged "vagueness" of the information hampered the preparation of his defense. The only details missing from the information are the name of the victim and the specific harm Petitioner was accused of causing.

---

[3] It is possible that Petitioner's attack is actually directed to the statute:

> The due process clauses of the Fifth and Fourteenth Amendments require criminal statutes to provide notice to the accused of the nature and specific elements of the crime charged. *Colautti v. Franklin*, 439 U.S. 379, 390 (1979); *North American Van Lines v. United States*, 243 F.2d 693, 697 (6th Cir. 1957). The "void for vagueness" doctrine requires that a statutory prohibition be sufficiently defined so that ordinary people, exercising ordinary common sense, can understand it and avoid conduct which is prohibited, without encouragement of arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *United States v. Avant*, 907 F.2d 623, 625 (6th Cir. 1990); *Nelson v. United States*, 796 F.2d 164, 167 (6th Cir. 1986), *citing Arnett v. Kennedy*, 416 U.S. 134, 159 (1974), *reh'g denied*, 417 U.S. 977 (1974), *quoting*, *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 579 (1973); *United States v. Thomas*, 864 F.2d 188, 194 (D.C. Cir. 1988). The law must be specific enough to give reasonable and fair notice in order to warn people to avoid conduct with criminal consequences. *Kolender v. Lawson*, 461 U.S. at 357; *Smith v. Goguen*, 415 U.S. 566, 574 (1974); *Stout v. Dallman*, 492 F.2d 992, 994 (6th Cir. 1974); *United States v. Thomas*, 864 F.2d at 194–195.

*United States v. Salisbury*, 983 F.2d 1369, 1377–78 (6th Cir. 1993). But the words in the statute are sufficiently specific and understood that ordinary people, exercising ordinary common sense, can understand it and avoid conduct which is prohibited. Michigan's child abuse statute was withstood vagueness challenges. *See, e.g., People v. Lawhorn*, 907 N.W.2d 832, 839 (Mich. Ct. App. 2017) (challenge to the vagueness of "physical harm"); *People v. Gregg*, 520 N.W.2d 690, 691–92 (Mich. Ct. App. 1994) (same). Indeed, the present child abuse statute was enacted, at least in part, to repeal "the vague and apparently unsatisfactory child cruelty and child torture statutory provisions" that preceded it. *People v. Kelley*, 446 N.W.2d 821, 827–28 (Mich. 1989).

That information was made readily available to Petitioner during the pretrial proceedings. Petitioner does not claim that he did not know whom he was accused of hurting or what harm he was accused of causing to her.  Moreover, he denied causing KH any harm; so the absence of further detail could hardly have prevented Petitioner from defending against the charge.

Petitioner's assertion that he did not have constitutionally adequate notice of the child abuse charge is absurd.  To the extent he challenges other defects in the information or amended information for failure to comply with state law, he fails to raise a cognizable habeas claim.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

## VIII.   Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists of reason could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying

21

this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.  Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

<u>**Conclusion**</u>

The Court will enter a judgment dismissing the petition and an order denying a certificate of appealability.

Dated:   <u>March 5, 2021</u>                                 <u>/s/ Janet T. Neff</u>
                                                                            Janet T. Neff
                                                                            United States District Judge